UNITED STATES COURT OF APPEALS

FOR THE EIGHTH CIRCUIT

_____

Nos. 94-4001 and 95-1047
_____

Thaddeus C. Pulla,                    *
                                      *
    Appellant/Cross-Appellee,   *
                                      *
    v.                                *   Appeal from the United States
                                      *   District Court for the Southern
Amoco Oil Company,                    *   District of Iowa.
                                      *
    Appellee/Cross-Appellant.   *


_____

Submitted: October 18, 1995

Filed: December 19, 1995
_____

Before McMILLIAN, Circuit Judge, WHITE,[*] Associate Justice (Ret.), and LOKEN,
Circuit Judge.

_____

WHITE, Associate Justice (Ret.).

## I.  INTRODUCTION

The Amoco Oil Company ("Amoco") appeals from a jury verdict that it
invaded the privacy of Thaddeus C. Pulla ("Pulla"), one of its employees, by
searching his credit card records to determine if he had abused his sick leave.
Amoco filed a series of post-trial motions challenging both the verdict and the
jury's award of $500,000 in

_____

[*] The Honorable Byron R. White, Associate Justice of the
United States Supreme Court, (Ret.), sitting by
designation, pursuant to 28 U.S.C. § 294(a).

punitive damages on a variety of grounds, but the district court rejected Amoco's motions for judgment as a matter of law, a new trial and a remittitur. *Pulla v. Amoco,* 882 F. Supp. 836 (S.D. Iowa 1994). On appeal, Amoco renews four of its claims of error, including its argument that the punitive damages award in this case violates due process. In his cross appeal, Pulla raises two claims of error. We exercise jurisdiction over these appeals pursuant to 28 U.S.C. § 1291, and we now AFFIRM in part, REVERSE in part, and REMAND this case for further proceedings.

## II. BACKGROUND

Pulla has worked continuously for Amoco since April 14, 1974. By 1989, when he was 48 years old, Pulla had worked his way up to a class 8 supervisor of new accounts in Amoco's credit card department. At that time, his supervisor, Robert Langois ("Langois"), judged his work to be satisfactory and noted that he was "promotable with future development." However, on May 22, 1989, Langois told Pulla that his performance was unsatisfactory and that he might be transferred to another department. Ten days later, Pulla was asked to consider remaining in his position until age 50 at which time he could consider early retirement. On July 28, 1989, Langois demoted Pulla to a class 7 sales authorization representative. While this transfer and demotion did not reduce his pay, it did reduce his possibilities for future pay increases. Isabella Hurless, a 45 year-old, replaced Pulla as the supervisor of new accounts.

After filing an administrative complaint with the Equal Opportunity Employment Commission on March 13, 1990, Pulla filed this action on February 20, 1991. He alleged that Amoco demoted and transferred him because of his age and in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and his employment contract. To support his ADEA claim, Pulla reported that Langois made several ageist comments, including such statements as Pulla was "too old for the job," "had been with the company too long," and "should consider early retirement."

Based on incidents that occurred after he filed his complaint, Pulla amended his complaint on September 9, 1992. This amendment alleged that Amoco had retaliated against him in violation of the ADEA and his employment contract and had violated state tort law by invading his privacy. The basis of the invasion of privacy claim (and the most significant alleged retaliatory action) was Amoco's inspection of his credit card records. This alleged invasion of privacy stemmed from the action of Pulla's coworker, Tammy Leckband ("Leckband"). Pulla and Leckband worked together at Amoco's Credit Card Service Center in Des Moines, Iowa, where they handled authorizations for customer purchases and investigations of related problems. Pulla often called in sick, and over the course of 1991, he missed two months of work. Leckband was one of the employees who covered his shift when he was absent. Because she was "mad" at Pulla for what she viewed as an abuse of his sick leave, which burdened her, Leckband checked Pulla's personal credit card records against

the days that he called in sick. In so doing, she found that Pulla had used his credit card at various restaurants and bars on days when he had called in sick. On November 8, 1991, she reported these observations to Anthony Wieczorek ("Wieczorek"), the individual who supervised her and Pulla.

Wieczorek admonished Leckband for reviewing Pulla's credit card records, and instructed her never to repeat such behavior. She was not otherwise disciplined. After finishing this conversation with Leckband, Wieczorek asked another employee to print out this same material and gave it to Bruce Williams, an Amoco Human Resources representative, who placed this information in Pulla's personnel file with red marks on the days in which Pulla had called in sick. Pulla soon learned that Amoco had retrieved this information, began to suffer feelings about being watched, and felt that this investigation put him in a bad light. Finally, Wieczorek referred to Pulla's absence problem in a subsequent evaluation, and singled Pulla out for the unique requirement that he obtain a doctor's note before submitting any claims for sick leave.

Amoco moved for summary judgment on the age discrimination claims, state law contract claims as well as the invasion of privacy claim. On January 11, 1994, the district court[1] granted summary judgment to Amoco on the state law contract claims, but ruled that a genuine

---

[1]Harold D. Vietor, District Court Judge for the Southern District of Iowa.

dispute of material fact existed as to the ADEA and the invasion of privacy claims.  Thus, Pulla's ADEA and invasion of privacy claims were tried to a jury.

After Pulla presented his evidence of age discrimination and invasion of privacy to the jury, Amoco requested that the district court[2] dismiss his claims as a matter of law under Fed. R. Civ. P. 50(a).  Amoco argued that Pulla had (1) only offered some stray comments referring to his age on his ADEA claim; (2) failed to present any evidence of retaliation based on his filing of this action; and (3) failed to establish that the search of his credit card records was "highly offensive" and "objectionable" so as to constitute an invasion of privacy.

The district court explained that it would take Amoco's Rule 50(a) motion under advisement.  However, it also noted that the invasion of privacy claim was "clearly submissible," and that he would also allow Pulla's ADEA claims to go to the jury although the evidence on these claims was thin.  After Pulla attempted to introduce more evidence in support of his privacy claim, and Amoco presented four

_____

[2]The parties consented to a trial before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the Hon. Mark W. Bennett, who at that time was serving as a magistrate judge for the Southern District of Iowa.  As Judge Bennett was appointed to the United States District Court for the Northern District of Iowa on August 30, 1994, we will refer to him and the proceedings before him as the district court.  The fact that he was appointed to the Northern District of Iowa and this case arises in the Southern District of Iowa is of no moment because all judges and magistrate judges are cross-designated to preside over both districts.  *Pulla*, 882 F. Supp. at 845 n.3.

additional witnesses to close out the presentation of all of the evidence, Amoco failed to renew its motion for judgment as a matter of law.

Amoco agreed to most of the jury instructions governing liability, but contended that the instruction on Amoco's ratification of the invasion of Pulla's privacy should not be submitted to the jury because no evidence in the record could support such a finding.  Amoco also objected to submitting the punitive damages instructions to the jury on the ground that there was insufficient evidence to support those instructions.  The court rejected these two objections and submitted all of Pulla's claims to the jury.

The jury found in favor of Amoco on the ADEA claims, but found for Pulla on the invasion of privacy claim.  On the invasion of privacy claim, the jury awarded Pulla $1 in actual damages for past pain and suffering and $1 in actual damages for future pain and suffering.  The jury also answered special interrogatories explaining that it found clear and convincing evidence that Amoco's invasion of Pulla's privacy willfully and wantonly disregarded his rights and that Amoco's conduct was specifically directed at Pulla.  Finally, the jury awarded Pulla a total of $500,000 in punitive damages.

On May 20, 1994, Amoco filed a series of post-trial motions, contending that, with respect to both the determination of liability and the award of punitive damages, it deserved judgment  as a matter

of law under Fed. R. Civ. P. 50, or in the alternative, that the court should order a new trial pursuant to Fed. R. Civ. P. 59 and remit the punitive damages award. The district court held that Amoco waived most of its claims of error, but proceeded to reject them all on the merits. In so doing, the district court engaged in the necessary post-trial review of the punitive damages award to determine whether it was excessive under Iowa law, unconstitutional under the Due Process Clause, and/or should be remitted. Focusing on the potential damages arising from invasions to credit card privacy, the district court concluded that the award did not warrant a new trial nor need to be remitted. Amoco then brought this timely appeal, challenging the district court's post-trial rulings. Pulla cross appealed, contending that the district court erroneously rejected his breach of contract claim, and that it erred by refusing to allow him to amend his complaint to conform to the evidence presented in support of a disparate impact violation of the ADEA.

## III. DISCUSSION

### A. AMOCO'S POST-TRIAL CHALLENGES

The district court carefully analyzed Amoco's claims of error, explaining that Amoco waived most of its claims by (1) failing to move for judgment as a matter of law on that ground; (2) failing to move for judgment as a matter of law at the close of the evidence; and/or (3) failing to object to the relevant jury instruction(s). In this appeal, Amoco re-asserts four of its claims of error, the

first three of which we deal with in this Section A.[3] These three claims challenge the district court's rulings that: (1) the search of Pulla's credit card records was sufficiently offensive so as to invade Pulla's privacy; (2) Amoco maliciously searched Pulla's credit card records so as to support an award of punitive damages; and (3) Amoco ratified the offensive conduct at issue.[4] The district court held that Amoco waived its first claim of error by failing to renew its motion for judgment as a matter of law at the close of all of the evidence as required by Rule 50(b), and by failing to object to the relevant jury instruction, thereby waiving its right to move for a new trial under Rule 59.[5] The court also explained that Amoco waived its second argument under Rule 50(b) by failing previously to raise it at all, and did not preserve it for a motion for a new trial by a sufficiently specific objection to a relevant jury instruction. Finally, the court held that, although Amoco had not

---

[3]As explained in Section C, we sustain Amoco's fourth claim of error: that the district court erroneously held that the punitive damages award passed constitutional muster.

[4]The district court carefully outlined Amoco's various post-trial claims of error in a chart, explaining why Amoco had waived its various claims, and how the court disposed of the claims on the merits. *Pulla*, 882 F. Supp. at 848.

[5]In its post-trial motion, Amoco parcelled its challenge to the invasion of privacy verdict into three specific claims of error: (1) Pulla did not suffer the necessary level of anguish; (2) Amoco had a legitimate interest in the information; and (3) Amoco's means were not objectionable. *Pulla*, 882 F. Supp. at 848. The district court explained that, for purposes of its post-trial motion for judgment as a matter of law, Amoco waived the second two arguments by failing previously to raise them at all, and it waived the first argument by failing to comply with Rule 50(b). *Id.* On appeal, Amoco abandons its second and third arguments, simply focusing on whether its conduct was sufficiently offensive and caused the necessary level of anguish to constitute an invasion of Pulla's privacy.

previously objected to the sufficiency of evidence on ratification (and thus, waived its motion for judgment as a matter of law), it did preserve the issue for a Rule 59 motion by objecting to the relevant jury instruction, but that this claim of error did not warrant a new trial.[6]

We concur with the district court that Amoco waived its right to file a post-trial motion for judgment as a matter of law. However because Amoco's motion for a new trial rested on evidentiary-as opposed to legal-grounds, the district court erred in holding that Amoco's failure to object properly to the relevant jury instructions waived its right to move for a new trial on two of its professed grounds but not the third. Thus, we must deal with the merits of these three grounds for a new trial. As to these three claims of error, we conclude that the district court's denial of Amoco's motion for a new trial did not constitute a clear abuse of its discretion.

### 1. Amoco's Post-Trial Motion for Judgment As A Matter of Law

Under Rule 50(b),[7] a litigant who fails to move for judgment as a matter of law at the close of the evidence cannot later

---

[6]As noted above, the district court also analyzed the substance of the claims of error waived by Amoco, and concluded that they were meritless.

[7]Rule 50(b) provides, in relevant part, that:
Whenever a motion for judgment as a matter of law *made at the close of all the evidence* is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion.
Fed. R. Civ. P. 50(b) (emphasis added).

argue-either in a post-trial Rule 50 motion or on appeal-that the verdict was supported by insufficient evidence. *Catlett v. Local 7370 of the United Paper Workers Int'l Union,* No. 95-1431, 1995 WL 638351, at *4 (8th Cir. Nov. 1, 1995); *Smith v. Farrell*, 852 F.2d 1074, 1075 (8th Cir. 1988); *Myers v. Norfolk Livestock Market, Inc.,* 696 F.2d 555, 558 (8th Cir. 1982).[8] Amoco argues that its failure to move for judgment at the close of the evidence should be excused as it submits would be the case in other circuits. While we have not endorsed the broad exception to Rule 50(b) adopted by some circuits,[9] we have adopted two narrow exceptions. Under the first exception, litigants can challenge a jury verdict without moving for judgment as a matter of law at the close of the evidence if their earlier Rule 50 motion (1) closely preceded the close of all of the evidence; and (2) the court somehow indicated that the movant need not renew its motion in order to preserve its right to challenge the verdict. *Halsell v. Kimberly-Clark Corp.,* 683 F.2d 285, 294 (8th

---

[8]*See* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2534, at 322-23 (1995); 5A James W. Moore, *Moore's Federal Practice,* ¶ 50.08, 50-84 - 50-85 (1995). The twin purposes of this rule are to: (1) enable the trial court to examine all of the evidence before submitting the question to the jury; and (2) alert the opposing party to any defect in its case, thereby affording it an opportunity to cure any such defects. *Halsell v. Kimberly-Clark Corp.,* 683 F.2d 285, 294 (8th Cir. 1982), *cert. denied,* 459 U.S. 1205 (1983); Moore, *supra,* ¶ 50.08, at 50-88.

[9]As discussed *infra*, the broad exception to Rule 50(b) allows litigants, post-trial, to move for judgment as a matter of law even though they failed to file a Rule 50 motion at the close of the evidence where (1) an earlier such motion has been filed and the district court defers ruling on the motion; (2) no evidence related to the claim is presented after the motion; and (3) very little time passes between the original assertion and the close of defendant's case.

Cir. 1982), *cert. denied*, 459 U.S. 1205 (1983); *United States v. 353 Cases * * * Mountain Valley Mineral Water,* 247 F.2d 473, 477 (8th Cir. 1957) ("as a practical matter the Government did all that was necessary to preserve" this issue for a post-trial Rule 50(b) motion). The second exception allows litigants to present sufficiency of the evidence challenges where not to do so would constitute plain error that would result in a manifest miscarriage of justice. *Jones v. St. Clair,* 804 F.2d 478, 479-80 (8th Cir. 1980); *353 Cases,* 247 F.2d at 477; 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2536, at 331 (1995). As to the first exception, Amoco's previous Rule 50 motion did not closely precede the close of the evidence. While Amoco does not suggest that this case fits within the plain error exception, we note that the district court's analysis of the merits suggests that the district court's failure to consider the merits of Amoco's Rule 50 (b) motion did not constitute plain error.

While we have never endorsed the broad exception to Rule 50(b),[10] we have previously assumed, without deciding, that we would do so.

---

[10]We acknowledge that it is a fine distinction between the exception set forth in *353 Cases,* 247 F.2d at 477, and *Halsell,* 683 F.2d at 294, and the broad exception adopted by other circuits. That is, the exception endorsed in *Halsell* and *353 Cases* requires that the judge somehow indicate that the litigant need not renew its motion for judgment as a matter of law, while the "broad exception" contains no such requirement. However, Myers, which was decided after *Halsell* and cited to *353 Cases,* makes clear that we have yet to adopt the broad exception to Rule 50(b). 696 F.2d at 558-59.

*Myers*, 696 F.2d at 558-59.[11] We again assume that we would interpret Rule 50(b) as allowing for such an exception to its literal terms, but hold that Amoco's failure to offer its Rule 50(b) motion at the close of the evidence does not fall within such an exception. Under the broad exception to Rule 50(b), courts excuse a litigant's failure to re-assert a Rule 50(b) motion where (1) the party files a Rule 50 motion at the close of plaintiff's case; (2) the district court defers ruling on the motion; (3) no evidence related to the claim is presented after the motion; and (4) very little time passes between the original assertion and the close of defendant's case. *Purcell v. Seguin State Bank & Trust Co.* , 999 F. 2d 950, 956 (5th Cir. 1993); *Boynton v. TRW, Inc.,* 858 F.2d 1178, 1186 (6th Cir. 1988) (en banc); Wright & Miller, *supra,* § 2537, at 339-43. In the instant case, however, the third and fourth factors are not present because Pulla made an effort to admit evidence supporting his invasion of privacy claim and Amoco presented four witnesses after Amoco moved for judgment as a matter of law. Hence, we concur with the district court's characterization that "Amoco's failure to reassert its motion was not a 'de minimis' departure from standard procedures, but a major oversight." *Pulla*, 882 F. Supp. at 855. Therefore, we refuse to excuse Amoco's failure to reassert its Rule 50(b) motion, and do not consider Amoco's argument that it deserved judgment as a matter of law.

---

[11]We note that some circuits have declined to adopt such a flexible approach, strictly construing Rule 50(b)'s requirement that objections must be filed at the close of the evidence to preserve any post-trial challenges to the verdict. *See, e.g., DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1195 n.4 (3d Cir. 1978).

<u>2.  Amoco's Motion for A New Trial</u>

Amoco also challenged the jury's verdict and award of punitive damages under Fed. R. Civ. P. 59, arguing that it deserved a new trial because the jury's findings were against the great weight of the evidence so as to constitute a miscarriage of justice.  *White v. Pence,* 961 F.2d 776, 780-81 (8th Cir. 1992).  Specifically, Amoco complained about the district court's rulings that (1) Amoco's behavior was so offensive as to constitute an invasion of privacy; (2) Amoco acted with the requisite malice to justify an award of punitive damages; and (3) Amoco ratified the wrongful acts at issue.[12]  The district court held that Amoco waived its right to challenge the first two findings by failing to object adequately to the relevant jury instruction(s), explaining that Amoco's failure to argue specifically that the evidence could not support a finding in Pulla's favor waived the issue under Fed. R. Civ. P. 51.  The district court then analyzed all of Amoco's contentions on the merits, concluding that the verdict was not against the weight of the evidence.

As we noted above, a litigant may move for a new trial under Rule 59 based on the overwhelming evidence contrary to the verdict without ever previously raising such an objection.  *Harris v. Zurich Insurance Co.,* 527 F.2d 528, 529-30 (8th Cir. 1975) (plaintiff waived his right to move for judgment as a matter of law, but still could file a post-trial motion for a new trial, and appeal the denial of

---

[12]As noted earlier, see n.3 *supra*, Amoco also set forth another ground for a new trial-i.e., the unconstitutionality of the punitive damages award-which we address in Section C.

that motion). Because the district court erred in ruling that Amoco waived its Rule 59 motion under Rule 51,[13] we must now consider the merits of each of its grounds for a new trial.

We have made clear that district courts enjoy broad discretion in choosing whether to grant a new trial, and thus, we accord great deference to their Rule 59 rulings. *White*, 961 F.2d at 781. While we may reverse a district court's denial of a Rule 59 motion where its judgment rests on an erroneous legal standard, *id.* at 782, where the basis of a Rule 59 ruling is that the verdict is not against the weight of the evidence, and where the district court balances and weighs the evidence based on the proper legal standards, *id.*, the court's denial of a Rule 59 motion is virtually unassailable, *Keenan v. Computer Associates International, Inc.* 13 F.3d 1266, 1269 (8th Cir. 1994). In such cases, we reverse for a clear abuse of discretion only where there is an "absolute absence of evidence" to support the jury's verdict. *Gopher Oil Co. v. Union Oil Co. of California,* 955 F.2d 519, 526 (8th Cir. 1992).

---

[13]While Rule 51 prevents litigants from offering legal arguments in a Rule 59 motion where the litigant did not previously present those specific objections to the district court, a party need not object to the relevant jury instructions on evidentiary grounds in order to file a Rule 59 motion on sufficiency of the evidence grounds. *See, e.g., Jones,* 804 F.2d at 480. That is, Rule 51 governs only challenges to the text of the jury instructions, requiring litigants to raise any objections to them in a timely manner in order to "afford the trial court an opportunity to cure a defective instruction and to prevent litigants from ensuring a new trial in the event of an adverse verdict by covertly relying on the error." *Doyne v. Union Electric Co.* , 953 F.2d 447, 450 (8th Cir. 1992) (internal quotations and citations omitted).

As indicated above, the district court, while ruling that there had been waivers under Rule 50(b) and also under Rule 51 except on the issue of ratification, went on to pass on the merits of the post-trial motion for judgment as a matter of law by pointing to the evidence justifying submitting the case to the jury. In light of that evidence, and after reviewing the rules that a district court must follow in ruling on motions for new trial, the district court also denied on the merits Amoco' s motion for new trial in its entirety. We conclude that this ruling was not a clear abuse of discretion under our precedents, except insofar as the district court held that the punitive damages award did not violate the Due Process Clause of the Fourteenth Amendment.

## B. PULLA'S CROSS APPEAL

Pulla argues in his cross appeal that the district court erred by (1) granting Amoco's motion for summary judgment on his breach of contract claim; and (2) refusing to conform the pleadings to the proof so as to allow him to present a disparate impact ADEA claim to the jury. We reject each of these claims of error in turn.

### 1. Breach of Contract Claim

In ruling for Amoco on Pulla's breach of contract claim, the district court concluded that Pulla failed to come forth with sufficient evidence to establish a fact issue as to whether Amoco's employment policies constituted an exception to Iowa's employment-at-will doctrine. The district court recognized that Iowa law provides

for an exception to the employment-at-will doctrine "'where a contract created by an employer's handbook or policy manual guarantees an employee that discharge will occur only for cause or under certain conditions.'" Aplt. Addendum at 6-7 (quoting *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 455 (Iowa 1989)). The court also explained that such a document can only give rise to a contract if it is sufficiently definite to constitute an offer, and that whether a document constitutes a contract is a question of law. *Id.* at 7 (quoting *Fogel*, 446 N.W.2d at 456). Finally, the court held that, because Pulla failed to present sufficient evidence to support the creation of a contract, Amoco deserved judgment as a matter of law. *Id.*

Pulla contends that the evidence of an employment contract, when viewed in the light most favorable to him, created a genuine dispute of material fact. Pulla explains that a series of documents, when viewed collectively, give rise to an employment contract. Pulla suggests that several documents are particularly important in supporting a just cause requirement: (1) a progressive discipline policy that managers "should" follow; (2) a merit employment policy that managers "should" follow; (3) statements by Amoco that it will follow the law and maintain equal opportunity in employment; and (4) statements that the workplace should be friendly and cooperative. Based on our review of these statements, we concur with the district court that they were not sufficiently definite or mandatory so as to constitute a binding contract. *See Falczynski v. Amoco Oil Co.,*

-16-

533 N.W.2d 226, 235 (Iowa 1995) (Amoco's nondiscrimination policies were not sufficiently definite so as to constitute a contract). Thus, we affirm the district court's grant of summary judgment to Amoco on Pulla's breach of contract claim.[14]

###### 2.  Motion to Amend The Pleadings

At trial, Pulla contended that Amoco's policy of not allowing non-supervisory personnel, such as himself, to apply for supervisory positions constituted a form of discrimination in violation of the ADEA.  After the district court pointed out that Pulla's pleadings did not state such a claim, Pulla moved to amend the pleadings to conform with the evidence.  The court summarily denied this motion.  Pulla now appeals this ruling, arguing that (1) this claim fell within the pleadings under the liberal pleading standard set forth in Fed. R. Civ. P. 8; and in the alternative, (2) that the district should have allowed him to conform the pleadings to the evidence under Fed. R. Civ. P. 15(b).  We reject each of these arguments in turn.

Pulla maintains that his claim that Amoco's policy of not allowing non-supervisory personnel to apply for supervisory positions constituted a form of age discrimination (i.e., under a disparate impact theory), and thus, fell within the Rule 8's liberal pleading standard.  Pulla suggests that his claim that Amoco discriminated

---

[14]Thus, we need not consider Amoco's argument that Iowa's exception to the employment-at-will doctrine does not extend to wrongful demotion claims.  *See Zimmerman v. Buchheit of Sparta, Inc.,* 645 N.E.2d 877, 881-82 (Ill. 1994).

against him allowed him to advance any specific theory that a certain act or policy effected such discrimination. Thus, Pulla asserts that, based on his general allegation of discrimination, he could later advance the discriminatory impact theory that Amoco's supervisor promotion policy constituted a form of age discrimination. We disagree. Pulla had the responsibility of specifically identifying the conduct challenged in his complaint in order to put Amoco on notice of the specific charges levied against it. *See Smith v. St. Bernards Regional Medical Ctr.,* 19 F. 3d 1254, 1255 (8th Cir. 1994). In Smith, we explained that a civil rights plaintiff who claimed that her employer discharged her on account of her race stated a specific claim for relief. *Id.* In that case, the face of the complaint pointed to the challenged action (i. e., Smith's discharge); however, in the instant case, Pulla's complaint failed to identify the action that Pulla now suggests he is challenging (i.e., Amoco's promotion policy).

Pulla also maintains that the district court abused its discretion by not allowing him to amend his pleadings to conform to the evidence under Fed. R. Civ. P. 15(b). Pulla contends that the district court's denial of his Rule 15(b) motion constituted an abuse of its discretion under *Gamma-10 Plastics v. American President Lines, Ltd.,* 32 F.3d 1244 (8th Cir. 1994) , *cert. denied,* 115 S. Ct. 1270 (1995). In *Gamma-10 Plastics,* we explained that "a district court is not required to grant a motion to amend on the basis of some evidence that would be relevant to the new claim if the same evidence was also relevant to a claim originally plead." 32 F.3d at 1256. In the instant case,

the evidence presented that related to Amoco's personnel policy served to support Pulla's intentional discrimination claim, and thus, did not necessarily put Amoco on notice that Pulla intended to challenge the policy as discriminatory in and of itself.  Therefore, we cannot conclude that the district court's denial of Pulla's Rule 15(b) motion constituted an abuse of its discretion.

## C.    CONSTITUTIONAL REVIEW OF PUNITIVE DAMAGES AWARD

It is clear that an award of punitive damages is subject to review to determine whether it violates principles of substantive due process, but as indicated by the plurality and other opinions filed in *TXO Prod.  Corp. v. Alliance Resources Corp.,* 113 S. Ct. 2711 (1993), it is not easy to clearly to discern the analytical framework for reviewing such awards.[15]  However, the Supreme Court has twice stated that punitive damages awards must comply with the Due Process Clause's "'general concern for reasonableness.'"  *Id.* at 2720 (quoting *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 18 (1991)). This concern requires that an award be "rational in light of [its] purpose to punish what has occurred and to deter its repetition."  *Haslip*, 499 U.S. at 20-21.  Amoco argues that the $500,000 punitive damages award levied against it in this case is unreasonable and unconstitutional.  While

---

[15]We are aware that the Supreme Court is presently considering a constitutional challenge to the amount of punitive damages awarded in *BMW of North America, Inc. v. Gore,* 646 So. 2d 619 (Ala. 1994), *cert. granted,* 115 S. Ct. 932 (1995).  However, given the stated interest of the parties in the expeditious resolution of this matter, and since we prepared for and heard oral argument despite the pendency of *Gore,* we choose not to withhold judgment until the Court decides *Gore.*

we accord great deference to the jury's verdict and the district court's assessment of the award, we hold that the amount of punitive damages awarded in this case is unreasonable and violates Amoco's substantive due process rights.

Whether a punitive damages award is reasonable for purposes of due process, turns on: (1) the harm inflicted on the plaintiff; (2) the reprehensibility of the defendant's conduct; (3) the likely potential harm to others arising from the complained of conduct; and (4) the wealth of the defendant.[16] *TXO,* 113 S. Ct. at 2721 (plurality opinion); 113 S. Ct. at 2726 (Kennedy, J., concurring) (explaining that the reprehensibility of defendant's conduct and its wealth are important factors). Courts must consider the totality of these four factors; that is, the presence (or absence) of any one of these factors cannot alone justify (or defeat) the constitutionality of a punitive damages award. For example, while a "shocking disparity" in the ratio between an award of punitive and actual damages may suggest that the punitive damages award is unconstitutional, the existence of potential damages and/or the reprehensibility of a defendant's conduct may overcome any such disparity. *Id.* at 2722. Moreover, not only does the presence of these factors justify a large punitive damages award, but their absence also can counsel against a large award.

---

[16]While a defendant's wealth may be taken into account in order to ensure that an award will adequately deter any future such conduct, a defendant's wealth cannot alone justify a large punitive damages award. *TXO,* 113 S. Ct. at 2723.

-20-

While TXO upheld a 526:1 ratio of punitive to actual damages on the basis of the potential damages arising from TXO's conduct, it explained that the potential damages must be evaluated in light of a defendant's actual conduct. The plurality opinion underscored that the relevant inquiry looks to "'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.'" *Id.* at 2721 (quoting *Haslip*, 499 U.S. at 21) (emphasis in original).[17]  To illustrate the nature of the "the harm likely to result" inquiry, *TXO* referred to the example of a defendant who fired a gun into a crowd, but only broke someone's glasses, causing little actual harm, but tremendous potential harm. *Id.* at 2721 (citing *Games v. Fleming Landfill, Inc.,* 413 S.E.2d 897, 902 (W. Va. 1991)). After offering this example of a situation where a large ratio between punitive and actual damages would pass constitutional muster, the *TXO* plurality explained that the relevant potential harm is what "the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." 113 S. Ct. at 2722.  Under this standard, the touchstone is the potential harm that would have likely resulted from the dangerousness inherent in defendant's actual conduct.  Thus, a court may not justify the award of punitive

_____

[17]The Court further underscored its commitment to the fact that the potential harm must be "likely," by highlighting that West Virginia similarly imposes a likelihood requirement. *See id.* at 2721 (quoting Games v. Fleming Landfill, Inc., 413 S.E.2d 897, 909 (W. Va. 1991)

-21-

damages in a particular case by overlooking the actual events and focusing on potential victims of similar *hypothetical* torts. *TXO,* 113 S. Ct. at 2734 (O'Connor, J., dissenting) ("Virtually any tort, however, can cause millions of dollars of harm if imposed against a sufficient number of victims.").

In the instant case, the district court erred by misconceiving the nature of potential harm.[18] The district court justified the $500,000 punitive damages award by reasoning that "[w]ere Amoco or others similarly situated to be undeterred from intruding on the privacy of employees' credit cards to check up on their use of sick leave or for any other purpose, the aggregate invasion of privacy into sensitive matters would be enormous indeed." *Pulla*, 882 F. Supp. at 887. In so doing, the district court focused on the hypothetical result of future such actions, and did not pinpoint any evidence connected to the actual search of Pulla's credit card records. This approach to analyzing punitive damages departed from TXO in that it did not require that the potential harm was likely to occur. We

_____

[18]Amoco also argues that, even if the correct conception of potential harm resulting from its conduct could support the amount of punitive damages awarded against it, that fact should not justify the award in the instant case because the jury instructions did not specify that the jury should consider potential damages as a basis for a punitive damages award. The jury instructions in *TXO*, however, also did not provide that the amount of potential damages could justify a larger award of punitive damages; yet, what the plurality considered to be substantial potential damages still played a large part in its holding that the punitive damages award passed constitutional muster. *See TXO,* 113 S. Ct. at 2735 (O'Connor, J., dissenting). Thus, as it is arguable that *TXO* forecloses Amoco's jury instruction argument, we assume that it does, and hold for Amoco on other grounds.

emphasize that, because Pulla failed to present any evidence that Amoco put any other individual's privacy at risk (e.g., Pulla did not suggest that the search of his credit card records stemmed from a company policy), the potential harm from the search of his credit cards can only be analyzed as the search affected him.  Thus, this case is different from the gunman who fires into a crowd, but only breaks someone's glasses, or a manufacturer who puts several thousand potentially dangerous products into the marketplace. *See, e.g., Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1127 (9th Cir. 1994) (upholding a punitive damages award of $6.5 million in a breast implant case because the manufacturer's distribution of the silicone gel breast implants knowingly exposed "thousands of women to a painful and debilitating disease"), *cert. denied,* 115 S. Ct. 734 (1995).

The district court also erred by failing to scrutinize correctly the punitive damages award by reference to the level of the offensiveness of Amoco's conduct.  We have previously noted that the offensiveness of the conduct at issue informs the judgment as to whether a punitive damages award "'jars one's constitutional sensibilities.'" *Burke v. Deere & Company,* 6 F.3d 497, 512 n.26 (8th Cir. 1993) (quoting *Haslip*, 499 U.S. at 1043), *cert. denied,* 114 S. Ct. 1063 (1994).[19]  In this case, the offensiveness of Amoco's conduct

---

[19]In *Burke*, we did not actually reach the constitutional inquiry because the evidence was insufficient to support any award of punitive damages, but we still noted the relationship between the offensiveness of the complained of conduct and the constitutionality of a punitive damages award.  In that case, we held that the "merely objectionable" act of "undertak[ing] a less costly alternative to remedy a perceived problem before moving to a more expensive recall program does not
amount to willful or wanton conduct in disregard of the rights and safety of others" and did not suffice to support an award of punitive damages.  6 F.3d at 512.

at issue starkly contrasts with the conduct that justified a 526:1 ratio of actual to punitive damages in *TXO*. *In TXO*, the company's top-level executives engaged in a deliberate plan of trickery and deception, while this case grew out of the resentment of a single employee and the perhaps understandable reaction of the supervisor that he should pass on the facts of Pulla's abuse of his sick leave to Amoco's personnel department. In the instant case, there is no evidence or indication that Wieczorek's conduct reflected a company policy or practice as was the case in *TXO*. In contrast, in *TXO*, the plaintiff presented evidence that TXO deliberately engaged in this wrongful conduct, and that prior lawsuits had been filed against it for similar misdeeds. 113 S. Ct. at 2726 (Kennedy, J., concurring). Similarly, we would view Amoco's conduct in a more critical light if Pulla had presented any evidence rebutting Amoco's assertion that this was an isolated and rare incident. *TXO*, 113 S. Ct. at 2722 n.28 (it is well settled that previous offensive conduct is "typically considered in assessing punitive damages"). However, as Pulla failed to do so, we must view this event as a one-time occurrence justifying a limited award of punitive damages.

Finally, the district court overly discounted the effect of the limited actual harm suffered by Pulla. While the Constitution does not impose any precise formula or ratio between the amount of punitive and actual damages, the amount of punitive damages must bear "some

-24-

proportion" and a "reasonable relationship" to the harm that actually occurred. *Id*. at 2721. The reasonableness of the relationship in any given case depends on the other factors outlined above (i.e., the likelihood and amount of potential damages, the offensiveness of the complained of conduct, and the wealth of the defendant). In this case, given the limited offensiveness of Amoco's actions and the unlikelihood of any serious potential harm from its conduct, we hold that the 250,000:1 ratio between punitive and actual damages is excessive, unreasonable and violative of due process.

## IV.  CONCLUSION

We AFFIRM the denial of Amoco's motion for a judgment of a matter of law, or in the alternative, motion for a new trial, except with respect to Amoco's constitutional challenge to the punitive damages award. We also AFFIRM the district court's grant of summary judgment to Amoco on Pulla's contract law claim as well as its denial of Pulla's motion to amend its complaint to include a disparate impact ADEA claim. Finally, as to the $500,000 award of punitive damages, we REVERSE the judgment of the district court that this award passes constitutional muster, and we REMAND this case for further proceeding consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

-25-